UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                )
UNITED STATES OF AMERICA        )
                                )
        v.                      )        Cr. No. 13-163-WES
                                )
ERNESTO MONELL                  )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

        Defendant Ernesto Monell has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (ECF No. 44), and an amended motion to vacate (ECF No. 55), in the above-captioned matter.  He has also filed a "supplement" motion for DNA testing in support of the Motion to Vacate (ECF No. 48) and a motion to dismiss the indictment (ECF No. 61).  The Government has filed responses to Monell's filings (ECF Nos. 50, 51, 56, 62), and Monell has filed replies to the Government's responses (ECF Nos. 52, 57).  The Court has determined that no hearing is necessary. For the reasons that follow, the Motion to Vacate, Motion for DNA Testing, and Motion to Dismiss are DENIED.

I.   Background and Travel

        On November 6, 2013, a Grand Jury sitting in the District of Rhode Island indicted Monell on a single count of being an inmate of a prison who possessed a prohibited object, specifically an

object that was designed and intended to be used as a weapon, in violation of 18 U.S.C. § 1791(a)(2)(b)(1)(B).

The events giving rise to the indictment occurred on the night of August 16, 2013, at the Donald W. Wyatt Detention Facility in Central Falls, Rhode Island (the "Wyatt").[1]  Shortly after 9:00 p.m., a disturbance broke out among several detainees, including Monell, in the dayroom of L-Pod at the Wyatt. (Tr. I 47-48.)  The correctional officer on duty, Michael Bessette, initiated a "Code Blue," indicating that detainees were fighting with a weapon involved and requesting backup to stop the disturbance. (Id. 48-49.)  Officer Bessette testified that he was about 30 feet away from Monell, who was involved in an altercation with another detainee, and saw an object in Monell's hand. (Id.)  Officer Bessette's supervisor, Lieutenant Peter Montgomery, who subsequently entered the dayroom, also testified that he saw a dark object wrapped in white in Monell's hand. (Id. 84-85.)  Officer Bessette and Lieutenant Montgomery further testified that they saw Monell moving his arm in a stabbing or striking motion at other detainees. (Id. 50-51, 84-85.)  Lieutenant Montgomery ordered the detainees to stop fighting and get on the ground. (Id.

---

[1] The summary of facts is taken from the testimony presented at Monell's trial. (Trial Transcript, Vol. I (ECF No. 37) ("Tr. I") 33-173.)

85.)  When they did not, he sprayed "OC" (Oleoresin Capsicum), a substance similar to pepper spray, which is used to subdue detainees.  (Id.)  When the situation was brought under control, the detainees involved were removed, either to the medical unit or segregation, while the rest of the pod was locked down.  (Id. 86.)  Robin Fox, RN, testified that four detainees, including Monell, were treated for various wounds, such as scratches, lacerations, gouges, and puncture wounds.  (Id.)  Nurse Fox stated that Monell's injuries included a left forefinger laceration and a skin tear on his right palm, and his hands were bloody.  (Id. 127-29.)  During the course of the subsequent investigation, a triangular metal object, which was sharpened at one end, was discovered in a trash can.  (Id. 92, 98.)  Lieutenant Montgomery described it as a "shank," or instrument used for stabbing, and identified it as the object he had seen in Monell's hand.  (Id. 94.)  Paul Villa, the investigator at the Wyatt who investigated the incident, testified that there were spots of blood on the floor of the dayroom, as did Lieutenant Montgomery.  (Id. 91, 139.)  The events were recorded by cameras positioned throughout the pod.  (Id. 70-73.)

Monell was arrested and arraigned on the Indictment on November 18, 2013.  (Indictment, ECF No. 5.)  He was convicted on May 20, 2014, following a jury trial.  (Trial Transcript, Volume II (ECF No. 39) ("Tr. II") 5.)  On August 6, 2014, Monell was

sentenced to a term of imprisonment of two years. (Sentencing Tr. (ECF No. 41) 8-9.) Judgment entered on August 8, 2014. (ECF No. 32.)

Monell filed a Notice of Appeal on August 11, 2014. (ECF No. 33.) Appellate Counsel thereafter filed a brief pursuant to <u>Anders v. California</u>, 386 U.S. 738 (1967), and, in a Judgment dated June 2, 2015, the Court of Appeals found that there was no non-frivolous basis for appeal, granted counsel's motion to withdraw, and affirmed Monell's conviction and sentence. (ECF No. 43.) The court's Mandate issued on June 24, 2015. (ECF No. 46.) Monell did not seek further review.

On June 9, 2015, Monell timely filed the instant Motion to Vacate.[2]

II. Law

A. Section 2255

Section 2255 provides in relevant part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed

---

[2] The Motion to Vacate is dated June 9, 2015, and is deemed filed on that date. <u>See</u> <u>Houston v. Lack</u>, 487 U.S. 266, 270 (1988) (concluding that pleadings are deemed filed on date prisoner relinquishes control over documents).

4

the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Generally, the grounds justifying relief under 28 U.S.C. § 2255(a) are limited. A court may grant relief pursuant to § 2255 in instances where the court finds a lack of jurisdiction, a constitutional error, or a fundamental error of law. United States v. Addonizio, 442 U.S. 178, 185 (1979). "[A]n error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" Id. (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). Moreover, "§ 2255 is not a substitute for direct appeal." Knight v. United States, 37 F.3d 769, 772 (1st Cir. 1994) (citing cases).

B.   Strickland

"The Sixth Amendment guarantees defendants the right to effective assistance of counsel." Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). However, "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." United States v. Natanel, 938 F.2d 302, 309-10 (1st Cir. 1991) (citing Strickland, 466 U.S. at 687-88).

A defendant who claims that he was deprived of his Sixth Amendment right to effective assistance of counsel must demonstrate:

(1) that his counsel's performance "fell below an objective standard of reasonableness"; and
(2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Strickland, 466 U.S. at 687-88, 694. In assessing the adequacy of counsel's performance, a defendant "'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' and the court then determines whether, in the particular context, the identified conduct or inaction was 'outside the wide range of professionally competent assistance.'" United States v. Manon, 608 F.3d 126, 131 (1st Cir. 2010) (quoting Strickland, 466 U.S. at 690). With respect to the prejudice requirement under Strickland, a "reasonable probability is one sufficient to undermine confidence in the outcome. . . . In making the prejudice assessment, [the court] focus[es] on the fundamental fairness of the proceeding." Id. (internal citations and quotation marks omitted). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687; see also Reyes-Vejerano v. United States, 117 F. Supp. 2d 103, 106

(D.P.R. 2000) ("The petitioner has the burden of proving both prongs of this test, and the burden is a heavy one."). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

Strickland instructs that "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689; see also id. ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Finally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.

III. Discussion

A.   Motion to Vacate

As noted above, Monell filed the Motion to Vacate (ECF No. 44) on June 9, 2015.  On September 11, 2015, the Government filed its response (ECF No. 50) ("First Response") to the Motion to Vacate.  Monell subsequently filed a reply (ECF No. 52) ("First Reply") to the Government's First Response and an amended version (ECF No. 55) of his Motion to Vacate ("Amended Motion to Vacate"), raising an additional claim.  The Government then filed a response to the Amended Motion to Vacate (ECF No. 56) ("Second Response"). Monell filed a reply to the Second Response (ECF No. 57) ("Second Reply"), which also appears to raise an additional claim, followed by a supplemental memorandum (ECF No. 58) ("Supplemental Mem."), which presents yet another claim.  On May 6, 2016, the Government filed an omnibus response (ECF No. 62) ("Omnibus Response") to Monell's Second Reply and Supplemental Mem.

The Amended Motion to Vacate, which the Court treats as a motion to amend, is granted.  To the extent the Second Reply and

Supplemental Mem. seek to raise additional grounds, they, too, are treated as motions to amend and are granted.[3]

In total, Monell presents the following claims of error: (1) ineffective assistance of counsel because counsel declined to request DNA analysis of the weapon Monell was charged with possessing; (2) ineffective assistance of counsel for failing to object to the improbability of certain testimony; (3) judicial error with respect to the Court's response to a jury question and supplemental instruction to the jury; (4) ineffective assistance of counsel due to counsel's failure to consult with Monell and keep him informed, specifically about the sidebar conference during which defense counsel expressed agreement with the Court's supplemental instruction; and (5) ineffective assistance of counsel based on counsel's failure to object to the fact that Monell's legs were shackled during the trial.

### 1. Ineffective assistance of counsel

Monell's first claim of ineffective assistance of counsel is based on counsel's failure to demand DNA analysis on the weapon Monell was charged with possessing, despite Monell's request that

---

[3] The Government correctly notes that Monell's "multiple amendments to his initial petition are in violation of Rule 15 [of the Federal Rules of Civil Procedure]," (Omnibus Response 4), and that pro se litigants are not excused from compliance with procedural rules, (id.). In the interest of judicial economy, however, the Court will address the merits of the additional claims.

he seek such testing. (Motion to Vacate 4; Affidavit of Fact (ECF No. 44-2) ¶ 1.) According to Monell, such testing would have determined his innocence. (Affidavit of Fact ¶ 2.)

Defense counsel cross-examined Inspector Villa regarding any testing of the weapon that was — or was not — done:

> Q.   Inspector, you took custody of the shank, correct?
>
> A.   I did.
>
> .   .   .
>
> Q.   Did you conduct any tests on the object?
>
> A.   I did not.
>
> Q.   Test for fingerprints?
>
> A.   I did not.
>
> Q.   You didn't test for any bodily fluids or anything on there?
>
> A.   I did not.

(Tr. I 167-68.) On redirect examination, Inspector Villa was asked:

> Q.   So as it relates to the questions concerning testing, does the Wyatt facility have a lab there?
>
> A.   No.
>
> Q.   This case, would you describe this case as routine?
>
> A.   Yes.
>
> Q.   You had the video, correct?
>
> A.   Correct.

Q.   Did you review the officers' reports as to what they had seen?

A.   Yes.

(Id. 171-72.)  Defense counsel followed up on recross-examination:

Q.   You don't have a lab at Wyatt, right?

A.   No.

Q.   Okay.  But you have access to a lab if you need something tested, correct?

A.   I would have to go through the Marshal Service to get something tested.

Q.   Right.  The Marshal Service that is part of the Department of Justice, correct?

A    Correct.  But I don't make that determination.  The marshals would make that determination as to whether they're going to test something or not.

Q.   But you could ask, right?

A.   I guess I could ask but --

Q.   Did you ask?

A.   I did not.

(Id. 172-73.)

Defense counsel also emphasized the lack of testing during his closing argument:

When you get into the jury room, you're going to get a chance to look at this item, the item with the white shoelace, the item that has no blood on it.  Okay? We don't know if there's any fingerprints on it or anything else like that, but we know there's no blood on it whatsoever.  You're going to be able to handle it, look at it, whatever, but the Government has not proved

11

beyond a reasonable doubt Mr. Monell had this.  Not even close.

(Id. 204.)

> The other thing, folks, we heard from Deputy Chief Marshal Remington this morning.  Okay?  They're available to help out in investigations.  Something that happens in the Wyatt is their responsibility.  Their responsibility because they have detainees at the Wyatt. All right?  So there was a lab available to test this. Of course there was.  But they didn't ask.  I don't know. Don't care?  Inspector Villa knows better.  He's been in police, law enforcement for almost 30 years he said. Why didn't he ask?  I don't know if he cares or doesn't care.  But you should care.  All right?  You should care.

(Id. 211.)

It is clear from the foregoing that counsel's strategy was to discredit the Government's witness, emphasize the lack of physical evidence connecting Monell to the object, and raise reasonable doubt in the minds of the jury.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Strickland, 466 U.S. at 688; see also id. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); Knight v. Spencer, 447 F.3d 6, 18 (1st Cir. 2006) (noting "the wide latitude of discretion available to defense counsel to conduct the defense in the manner of his or her own choosing"); Phoenix v. Matesanz, 233 F.3d 77, 84 (1st Cir. 2000) ("Defense counsel is allowed to make strategic

decisions, within the wide bounds of professional competence, as to which leads to follow up, and on which areas to focus his energies."). Counsel's decision to rely on pointed questioning of the Government's witness, rather than attempting to obtain DNA testing of the object in question, is a strategic choice which the Court, in hindsight, will not question. See Strickland, 466 U.S. at 689 (noting court's obligation "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"); see also Yarborough v. Gentry, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); Lema, 987 F.2d at 56 ("While these trial tactics may appear dubious to the petitioner in hindsight, especially in the grim reflection of the intervening convictions, the reviewing court must be persuaded that the failed trial strategy was not within the 'wide range of reasonable professional assistance' contemplated by Strickland."). The Court is not persuaded that counsel's chosen strategy was outside the "wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, under the circumstances.

Moreover, even assuming, for the sake of argument, that counsel should have sought DNA testing, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting

aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. Monell has failed to show that the alleged error created more than a "*possibility* of prejudice," but that it "worked to his *actual* and substantial disadvantage," thereby infecting the entire proceeding "with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). Two eyewitnesses testified that they saw an object in Monell's hand during the altercation and that he was making striking or stabbing motions at other detainees. (Tr. I 48, 50, 52, 84-85.) Monell's actions were recorded by cameras in the dayroom. (Id. 62-63, 142.) Nurse Fox testified that the victims' wounds were consistent with being made with a sharp instrument. (Id. 111, 123.) Finally, Monell's wound was consistent with having held a sharp object in his hand. (Id. 156, 158.) Even if testing revealed that Monell's DNA was not present on the shank found in the trash can, Monell has not demonstrated a reasonable probability that the outcome of the trial would have been different. See Manon, 608 F.3d at 135 (noting that defendant had not shown that "the result of the proceeding would have been different" had counsel chosen a different strategy (quoting Strickland, 466 U.S. at 694)).

2.   Ineffective assistance of counsel

Monell argues:

No human under "Natural Law" could see a one inch grey colored object[4] from thirty feet away, in a swingin[g] motion. It would be unbelievable and against the laws of nature for a 3 inch weapon that stabbed 3 people a total of 11 times to not contain one drop of visible blood and DNA.

(Motion to Vacate 5.) While a violation of "natural law" is not a cognizable claim under § 2255, <u>see</u> 28 U.S.C. § 2255(a), Monell characterizes the claim as one of ineffective assistance of counsel, (Motion to Vacate 6), and the Court treats it as such.

The testimony to which Monell refers is that of Officer Bessette that he observed an object in Monell's hand while Monell was involved in an altercation with another inmate from a distance of "[a]bout 30 feet." (Tr. I 48.) Defense counsel cross-examined Officer Bessette about his statement:

> Q. And from where you were at the desk all the way across the pod, you saw Mr. Wylie and Mr. Monell, right?
>
> A. Correct.
>
> Q. And you saw them fighting?
>
> A. Correct.
>
> Q. And you said you saw an object in Mr. Monell's hand?
>
> A. Correct.

---

[4] Lieutenant Montgomery testified that the piece of metal recovered was "approximately two to three inches in length, probably two inches wide" and "had a shoelace wrapped around it." (Mem. in Support of Motion to Vacate (ECF No. 44-1) 4 (citing Tr. I 92)). Monell states that because his "palm/hand length is 5 inches and the weapon was 3 inches in length, there could be no more than 1 inch visible. (<u>Id.</u> 4.)

Q.   All right.   Now, it's fair to say that after you made that initial viewing all the other inmates started fighting, running around, throwing chairs, right?

A.   Correct.

Q.   Yelling?

A.   Correct.

Q.   Got loud very quickly?

A.   Yes.

(Id. 74.)   Counsel also established that Officer Bessette wrote his report after seeing the video of the incident and that Officer Bessette had viewed the video on numerous occasions:

Q.   You wrote this after you watched the video, right?

A.   Correct.

Q.   Did you identify all those people from the video?

A.   Correct.

Q.   Do you remember seeing them fighting or just from the video?

A.   I remember most of them fighting, sir.

Q.   From being there?

A.   Yes, sir.

Q.   Okay.

. . .

Q.   So you remember most of them fighting from being there?

A.   Yes.

Q.   Not from the video?

A.   From both, sir.

. . .

Q.   How many times have you watched that video?

A.   Several, sir.  I do not have a direct count.

Q    More than ten?

A.   Yes, sir.

Q.   Okay.  You watched it the day after, right?

A.   Yes, sir.

Q.   You watched it today?

A.   Yes, sir.

Q.   When was the last time before today?

A.   Monday, sir.

Q.   Monday?

A.   Yes, sir.  Last Monday.

Q.   Last Monday?

A.   Yes, sir.

Q.   And you've seen it more than that, too, correct?

A.   I've seen it in the past, yes, sir.

(Id. 75-77.)

Counsel returned to these themes during his closing argument:

Let me start talking a little bit about Officer
Bessette.  Okay?  He's on duty.  He's on duty and this
fight breaks out and it's chaos, and there's yelling,
and there's chairs being thrown, and he's trying to call

17

it and he's moving back to the slider to stay out of the fray. Okay? That's the chaotic situation he's in immediately.

. . .

Now, Officer Bessette testified that he could see this weapon from across the room. All right? You'll be able to see the video. You'll see him in the video. I can't say that his point of view looking across the entire pod is any better than your view in the video as far as being able to see some kind of weapon from all the way across the pod in the middle of the chaos, but it also suggests that Officer Bessette's testimony comes to you not fresh but after repeated viewing of the video that you're going to see.

So certainly he had a specific memory the day it happened but then he wrote his report afterwards, after he watched the video.

I don't think Officer Bessette came up here and lied or anything like that. That's not what I'm suggesting. What I'm telling you is that when you watch something, a video, it changes what you remember being in there.

. . .

So Officer Bessette told you he's seen this video upwards of ten times I think is what he testified to. I just suggest that that is influencing what he remembers from that day.

(Id. 205-07.)

Counsel sought to undermine Officer Bessette's testimony by emphasizing the distance from which he testified he saw the object, the chaotic situation in which Officer Bessette found himself, and the potential influence of viewing the video on Officer Bessette's recollection in order to raise reasonable doubt in the minds of the jurors. The fact that counsel's cross-examination failed to

18

persuade the jury does not establish that counsel provided ineffective assistance.  Phoenix, 233 F.3d at 84 ("The mere fact that [defense counsel's] cross-examination failed to persuade the jury of [the defendant's] innocence is not enough to establish ineffective assistance."); see also Natanel, 938 F.2d at 309-10).

In addition, defense counsel cross-examined Nurse Fox about two of the Government's exhibits, photographs of another detainee's and Monell's wounds, which depicted blood:

Q.   And you said that was a puncture wound?

A.   Yes.

Q.   Okay.  Obviously that hasn't been cleaned up yet?

A.   That's correct.

Q.   Okay.  So you can see blood there on his arm, right?

A.   Yes.

Q.   See the stain on his shirt?

A.   I do.

.  .  .

Q.   That's blood?

A.   Yes.

(Id. 131.)  Counsel then questioned Nurse Fox about the photograph of Monell's injuries:

Q.   Down here on his left arm, that's the ten-centimeter scratch or cut?

A.   Yes.

19

Q.    Down on his fingers there, that's blood, right?

A.    Yes.

Q.    All over his hands?

A.    Yes.

Q.    Because he had the cut on his finger and he had a cut on the other hand, right?

A.    Yes.

(Id. 132-33.)

Counsel also stressed the lack of blood on the object during closing arguments:

> When you get into the jury room, you're going to get a chance to look at this item, the item with the white shoelace, the item that has no blood on it.  Okay?  We don't know if there's any fingerprints on it or anything else like that, but we know there's no blood on it whatsoever.

(Id. 204; see also id. 208 ("This is not the item that he had in his hand.  There's no blood on this.").)

The issues which form the basis of Monell's second claim were brought out at trial.  Counsel questioned Officer Bessette's ability to see the object from thirty feet away.  He questioned Nurse Fox regarding the presence of blood on the detainees, including Monell.  He emphasized the lack of blood on the object during closing arguments.  That the jury was unconvinced by counsel's cross-examination of the Government's witnesses does not render his assistance ineffective.  See Phoenix, 233 F.3d at 84;

20

<u>Natanel</u>, 938 F.2d at 309-10.  Monell has not met his burden of demonstrating that his trial counsel was ineffective.  <u>See</u> <u>Reyes-Vejerano</u>, 117 F. Supp. 2d at 106 (noting petitioner's "heavy" burden of proving both prongs of the <u>Strickland</u> test).[5]

  3. Judicial error

 Monell next claims that "Chief Judge William E. Smith intruded upon the province of the jury on the second day of trial, after the jury posed a question to the Court seeking clarification of the instruction." (Amended Motion to Vacate 2.)  Monell alleges that the Court's response and supplemental instruction prejudiced him by affecting the outcome of the trial, "which was a miscarriage of justice and structural error." (<u>Id.</u> 3.)

 The jury posed the following question: "Does a non-prohibited object used in a prohibited manner become a prohibited object?" (Tr. II 3.)  The Court responded:

> The answer to your question is yes.  An object that is non-prohibited, whatever it might be, can be converted into a prohibited object if the person using it either designs it or modifies it or uses it with or without modification with the intention to make it a weapon. All right?

---

[5] Because the Court has found that Monell has not demonstrated that counsel's performance was deficient, it need not address the issue of prejudice.  <u>See</u> <u>Strickland</u>, 466 U.S. at 697 (noting that the court need not discuss "both components of the inquiry if the defendant makes an insufficient showing on one").

(Id.)  The Court then repeated the answer.  (Id.)  The Government
responds that Monell's claim should be denied on both procedural
and substantive grounds.  (Second Response 1.)

With respect to the procedural argument, the Government
contends that because Monell "did not advance his claim of
instructional error during the original proceedings, whether at
trial or on direct appeal," (id. 2), he has procedurally defaulted
the claim, requiring him to show both cause for the default and
actual prejudice, (id.).  Monell counters that the ineffectiveness
of both trial counsel, for agreeing to the supplemental
instruction, and appellate counsel, for forfeiting the claim,
constitutes cause.  (Second Reply 5-7.)  Other than his initial
statement, Monell does not attempt to demonstrate prejudice.

The Court, however, need not resolve the issue on procedural
grounds, as the claim clearly fails on the merits.  Section 1791
defines prohibited object, in relevant part, as "an object that is
designed or intended to be used as a weapon . . . ."  18 U.S.C.
§ 1791(d)(1)(B).  The Court quoted the statutory definition of
"prohibited object" in its original instructions to the jury.  (Tr.
I 183.)  The Court's supplemental instruction was consistent with
the language of the statute and its original jury instruction.

"It is well established that the trial judge is not limited
to instructions in the abstract.  The judge may explain, comment

22

upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles." United States v. Maguire, 918 F.2d 254, 268 (1st Cir. 1990). The First Circuit addressed a similar issue in United States v. Sabetta, 373 F.3d 75 (1st Cir. 2004). There, the defendant was charged with being a felon in possession of a firearm. Id. at 77-78. The firearm in question was located in a hidden compartment behind the glove compartment of a car that the defendant was driving but did not own. Id. at 77. During its deliberations, the jury posed two questions to the court, the second of which was: "does being in a vehicle that contains a concealed firearm constitute possession?" Id. at 78. The court responded:

> Now I discussed constructive possession with you, and I think that comes up as a result of your second question here. . . . [T]here's several requirements for constructive possession. If, for example, someone is in a vehicle and knows, knows that a gun is in the glove compartment, and has the intention to exercise dominion and control over that item, that's constructive possession. So that illustrates the difference between constructive possession and actual possession.

Id. at 79-80 (alterations in original). The First Circuit found that, despite using a factual scenario from the case before him, the judge's answer "did not usurp the jury's fact finding role." Id. at 80. The appellate court stated that:

> The jury, as the finder of fact, was required to determine whether the defendant knew that a gun was in

the glove compartment and whether the defendant had the
intention to exercise dominion and control over the gun.
The judge's rejoinder did not answer either of these
questions for the jury.

Id.

The same is true here.  The Court's response to the jury's
question simply elaborated on the definition of "prohibited
object" which it had previously given to the jury.  It did not
answer the two remaining questions[6] the jury had to decide in order
to find Monell guilty: (1) whether Monell possessed the object;
and (2) whether the object was a prohibited object, specifically
an object that was "designed or intended to be used as a weapon."
18 U.S.C. § 1791(a)(2), (d)(1)(B).  Therefore, the Court did not
"intrude[] upon the province of the jury," (Amended Motion to
Vacate 2), or "usurp the jury's fact finding role," Sabetta, 373
F.3d at 80.

4.  Ineffective assistance of counsel

In his Second Reply, Monell contends that trial counsel was
ineffective for failing to consult with Monell and keep him
informed regarding sidebar conferences, specifically the
discussion relating to the supplemental instruction discussed

---

[6] The prosecution and defense had stipulated to the fact that
"on August 16th of 2013, Ernesto Monell was an inmate, lawfully
detained at the direction of the Attorney General at the Wyatt
Detention Facility in Central Falls, Rhode Island."  (Tr. I 31);
see also 18 U.S.C. § 1791(a)(2).

above.  (Second Reply 3-6.)  Presumably, Monell's implication is that, had he been informed, he would have instructed counsel to object to the instruction.

After the Court had answered the jury's question and sent the jurors back to the jury room to continue their deliberations, (Tr. II 3), the Court stated: "Neither of you objected but let's get it on the record for that answer, as you told me earlier," (id. 4). Defense counsel responded "Yes, your Honor.  We were agreeable to that."  (Id.)  The Government also replied "Yes, your Honor." (Id.)  Clearly the Court had consulted with both attorneys prior to answering the jury's question and giving the supplemental instruction and was placing their assent on the record.  Although the jury was not present during this exchange, the transcript does not indicate that Monell was absent from the courtroom.  (Id. 3-4.)  He apparently was not present for the initial discussion about the instruction, which is the basis of his claim.

As the Court has already found that there was no judicial error with respect to the supplemental instruction, counsel cannot be found to have been ineffective for agreeing to the supplemental instruction.[7]  See Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999)

---

[7] Monell also conplains that his appellate counsel forfeited this claim without explanation.  (Second Reply 6-7.)  However, for the reasons stated above with respect to trial counsel, appellate counsel was not ineffective for failing to raise the issue on appeal.

("Obviously, counsel's performance was not deficient if he declined to pursue a futile tactic."); see also Knight v. Spencer, 447 F.3d at 16 ("[F]ailing to pursue a futile tactic does not amount to constitutional ineffectiveness." (quoting Vieux, 184 F.3d at 64)); Dure v. United States, 127 F. Supp. 2d 276, 280 (D.R.I. 2001) ("Counsel cannot be deemed ineffective for failing to pursue futile arguments."). Therefore, Monell's ineffectiveness claim on this ground is rejected.

### 5. Ineffective assistance of counsel

Lastly, Monell alleges the fact that the Court allowed the Marshals to shackle his ankles during the trial was a fundamental "miscarriage of justice" and denied him his right to be "judged by an impartial jury of [his] peers." (Supplemental Mem. 2.) He further suggests that counsel was ineffective for failing to object, or file a motion, to the fact that Monell was shackled during the trial. (Id.)

In its Omnibus Response, which Monell has not disputed, the Government states that:

> The record is void of any reference to whether or not the Defendant was or was not shackled. Assuming arguendo that the Defendant was shackled, it is clear the jury was oblivious to that fact. Any movement of the Defendant during the proceedings occurred outside of the jury's presence. The area below the defense table was protected by a heavy curtain. The Defendant's legs were hidden from the view of the jury. Because of the Defendant's violent history and recent attack on a Massachusetts corrections officer, the Marshal's Service

26

determined that leg shackles were appropriate. The
Court took the appropriate prophylactic measures to
prevent the jury from observing these reasonable
restraints. Since the jury was unaware that he was
restrained it can hardly be claimed he was prejudiced by
wearing the restraints. Because the Court prevented the
jury from being made aware of his shackles it is
axiomatic that Counsel's failure to object to the use of
the restraints did not amount to ineffective assistance.
This is particularly true when one considers that the
jury was aware that the Defendant was in custody at a
federal detention facility, a fact the Government was
required to prove beyond a reasonable doubt.

(Omnibus Response 5-6.)

The Court has reviewed the trial transcript, and the
Government is correct in stating that there is no indication
whatsoever that the jury was aware that Monell was restrained. He
was present in the courtroom when the jury was brought in. He
remained in the courtroom when the jury was taken out. Monell did
not testify; therefore, he had no occasion to move to the witness
stand. The Court did everything it could to prevent the jury from
discovering that Monell's ankles were shackled, and its efforts
were successful. Therefore, he was not prejudiced by the fact
that he was shackled.

As a result, there was nothing to which counsel could object
or motion which counsel could file. See Knight v. Spencer, 447
F.3d at 15-16 (rejecting argument that counsel was ineffective for
failing to make futile objections): Vieux, 184 F.3d at 64 ("Counsel
is not required to waste the court's time with futile or frivolous

motions." (quoting <u>United States v. Wright</u>, 573 F.2d 681, 684 (1st Cir. 1978))). Based on the foregoing, the Court rejects Monell's final claim in its entirety.

B.   Motion for DNA Testing

In support of the Motion to Vacate, Monell filed a Motion for DNA Testing (ECF No. 48) pursuant to 18 U.S.C. § 3600 on August 24, 2015. On September 23, 2015, the Government filed a response (ECF No. 51) ("Objection to Motion for DNA Testing") and supporting memorandum (ECF No. 51-1), arguing that Monell "failed to satisfy the statutory requirements for the granting of such relief and that the relief sought will not produce new material evidence raising a reasonable probability that the applicant did not commit the offense charged," (<u>id.</u> 1). Monell subsequently filed an affidavit of facts (ECF No. 53) in support of the Motion for DNA Testing in which he affirms his innocence of the charge.

Section 3600 provides in general that "[u]pon written motion by an individual sentenced to imprisonment or death pursuant to a conviction for a Federal offense . . . , the court that entered the judgment of conviction shall order DNA testing of specific evidence" if all listed conditions are met. 18 U.S.C § 3600(a). Monell states that the Motion for DNA Testing is filed in support of his claim that trial counsel was ineffective for refusing to request DNA testing of the weapon he was charged with possessing.

(Motion for DNA Testing ¶ 2.)  In his accompanying affidavit Monell states:

> 3.  I am innocent of the charge 18 U.S.C. § 1791(a)(2)(b)(1)(B) as . . . charged by the United States Government on my arraignment date of November 18, 2013.
>
> 4.  I never possessed the weapon/shank as charged, and presented as evidence in the indictment and to the impaneled jury.
>
> 5.  It was a misidentification by officer Bessette of what I possessed in my hand and the DNA testing under 18 U.S.C. § 3600 will prove my innocence and claim.

(Affidavit in Support of Motion for DNA Testing ¶¶ 3-5.)  Thus, Monell has satisfied the statute's first requirement, that he assert, under penalty of perjury, that he is "actually innocent of the Federal offense for which" he was imprisoned.  18 U.S.C § 3600(a)(1)(A).

Thereafter, however, the Motion for DNA Testing falters.  For example, under § 3600, the following requirements must also be met:

> (6) The applicant identifies a theory of defense that--
>
> > (A) is not inconsistent with an affirmative defense presented at trial; and
> >
> > (B) would establish the actual innocence of the applicant of the Federal or State offense referenced in the applicant's assertion under paragraph (1).
>
> (7) If the applicant was convicted following a trial, the identity of the perpetrator was at issue in the trial.

(8) The proposed DNA testing of the specific evidence may produce new material evidence that would--

> (A) support the theory of defense referenced in paragraph (6); and

> (B) raise a reasonable probability that the applicant did not commit the offense.

18 U.S.C § 3600(a)(6)-(8). Monell has not identified a new theory of defense; rather, he asserts the same defense counsel raised at trial, that there was no evidence linking Monell to the shank discovered after the incident. Further, Monell's identity was never at issue during the trial. The issue was whether he possessed a prohibited object. Moreover, as previously discussed, the presence — or lack thereof — of Monell's DNA on the shank would not definitively establish, or raise a reasonable probability of, Monell's innocence, as two witnesses testified that they saw an object in his hand and his actions during the incident were recorded on video.

Finally, the Motion for DNA Testing is untimely. Regarding timeliness, § 3600(a)(10) requires that:

The motion [be] made in a timely fashion, subject to the following conditions:

> (A) There shall be a rebuttable presumption of timeliness if the motion is made within 60 months of enactment of the Justice For All Act of 2004 or within 36 months of conviction, whichever comes later.

> . . .

30

(B) There shall be a rebuttable presumption against timeliness for any motion not satisfying subparagraph (A) above. Such presumption may be rebutted upon the court's finding--

(i) that the applicant was or is incompetent and such incompetence substantially contributed to the delay in the applicant's motion for a DNA test;

(ii) the evidence to be tested is newly discovered DNA evidence;

(iii) that the applicant's motion is based solely upon the applicant's own assertion of innocence and, after considering all relevant facts and circumstances surrounding the motion, a denial would result in a manifest injustice; or

(iv) upon good cause shown.

18 U.S.C § 3600(a)(10).  Because Monell's motion was not filed within 36 months of his 2014 conviction, he must rebut the presumption of timeliness.  Id. § 3600(a)(10)(B).  He has not done so.  Monell was, and is, competent.  The evidence he seeks to have tested is not newly discovered DNA evidence.  The Motion for DNA Testing is based solely on his own assertion of innocence, and Monell has not shown that denial of the motion will result in a manifest injustice.  Further, the Court finds that Monell has not shown good cause.

Monell has not satisfied the requisite conditions under § 3600(a).  Accordingly, the Motion for DNA Testing is DENIED.

C.   Motion to Dismiss

Monell has filed a motion to dismiss the indictment (ECF No. 61) ("Motion to Dismiss") based on the Government's alleged "breach" of the sixty-day extension of time granted to file its response to Monell's Second Reply and Supplemental Mem., both of which raised additional claims. (Motion to Dismiss 1.) Monell also states that the "Government still refuses to grant [his] constitutional right to have [the] alleged weapon tested for [his] DNA." (Id.) The Motion to Dismiss is DENIED.

From the Docket, it appears that the "breach" of deadline to which Monell refers is the Government's filing on May 6, 2016, of its Omnibus Response. According to a text order entered on February 18, 2016, the Court granted the Government's motion (ECF No. 59) requesting an additional sixty days to respond to Monell's amendments to the Motion to Vacate. The Government's response was due on April 10, 2016. (See Docket.) The Omnibus Response was filed on May 6, 2016. Therefore, Monell is correct that the Omnibus Response was tardy. The Court, however, will not dismiss the Indictment on this basis, particularly given the number of filings to which the Government was required to respond.

Monell provides no basis for his statement that the Government "still refuses" to grant his purported constitutional right to DNA testing. (Motion to Dismiss 1.) He points to no request to, or response from, the Government. Moreover, even if there were such

request, Monell has no "constitutional right" to DNA testing. As discussed above, the Motion for DNA Testing was brought pursuant to 18 U.S.C. § 3600, (Motion for DNA Testing 1), which provides a statutory right to DNA testing if, and only if, certain conditions are met.

Monell's Motion to Dismiss is without merit. Accordingly, it is DENIED.

IV. Conclusion

To summarize, the Court has ruled as follows:

The Amended Motion to Vacate (ECF No. 55), which the Court treats as a motion to amend, is GRANTED. To the extent the Second Reply (ECF No. 57) and Supplemental Mem. (ECF No. 58) seek to further amend the Motion to Vacate, they are also treated as motions to amend and are GRANTED.

The Motion to Vacate (ECF No. 44), as amended, is DENIED.

The Motion for DNA Testing (ECF No. 48) is DENIED.

Lastly, the Motion to Dismiss (ECF No. 61) is DENIED.

RULING ON CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings in the United States District Courts, this Court hereby finds that this case is <u>not</u> appropriate for the issuance of a certificate of appealability (COA) because Petitioner has failed

to make "a substantial showing of the denial of a constitutional right" as to any claim, as required by 28 U.S.C. § 2253(c)(2).

Petitioner is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal in this matter. <u>See</u> Rule 11(a), Rules Governing Section 2255 Proceedings.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  November 17, 2017